IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Chief Judge

Criminal Case No.  06-CR-00342-LTB

UNITED STATES OF AMERICA,

       Plaintiff,

v.

KENNETH DEAN STURM,

       Defendant.

---

## ORDER

---

The defendant, Kenneth Dean Sturm, stands indicted of possession of a firearm after conviction of a felony, 18 U.S.C. § 922(g)(1), and possession of child pornography, 18 U.S.C. § 2252A(a)(5)(B).  He moves for severance of the counts and for suppression of evidence and statements obtained during execution of a warrant at his residence.  The motions are adequately briefed and I benefit from evidence taken on January 26 and 30, 2007 and the oral arguments of counsel.  For the reasons stated below, I GRANT the motion for severance, GRANT the motion for suppression of statements, and DENY the motion for suppression of physical evidence.

Testifying for the Government were agents of the United States Bureau of Immigration and Customs Enforcement ("ICE"): Special Agent Anna Wells, Special Agent Brian Palmer, Special Agent Ed Schwaigert, and Senior Special Agent Richard Stoffregen, a computer forensics expert.  Mr. Sturm testified on his own behalf.  Except where recollections have faded, the witnesses agreed on the operative facts.

**I.  Findings of fact**

    **A.**      **Probable cause for the warrant**

    I begin by reviewing the affidavit on which the issuing magistrate relied in authorizing the search.  Agent Wells averred in seventeen, detail-laden pages the factual predicates for the magistrate judge's finding of probable cause.  The affidavit describes Agent Wells' training and experience as a Special Agent charged with investigating the sexual exploitation of children.  Agent Wells disclosed her knowledge of the internet and its accessibility.  Based upon her experience and training, Agent Wells generalized that persons with sexual interest in children commonly collect child pornography, rarely dispose of the material once obtained, and secret it within the curtilage of their homes.  She also stated that perpetrators obtain exploitive images over the internet and store the images on their computers and on computer-related media, such as floppy discs and CD-ROM discs.

    **1.**      **Illegal.CP**

    Agent Wells averred that ICE agents in New jersey had in October, 2005 investigated a web site called Illegal.CP and found it to contain thousands of images and videos of child pornography, made available to subscribers for a fee.  Illegal.CP's initial, or "banner," page declaimed, "Now you are in (sic) few minutes away from the best children porn site on the net!" and contained more than a dozen images of minors engaging in sex acts.  The banner page promised subscribers access to "tons of uncensored forbidden pics…, forbidden stories, and, of course, many videos."

    An undercover agent purchased access to Illegal.CP.  The agent received an email containing a login identifier and password, which the agent used successfully to access the site,

and a statement that the agent's credit would be charged $79.99 by an entity called "ADSOFT."
Upon entering the site, the agent confronted the proclamation, "Our site is considered to be illegal
in all countries."  The site contained thousands of illegal images.

On November 17, 2005, having located the server that hosted Illegal.CP, agents executed
a warrant search of it.  The search confirmed that the server contained the offending images,
revealed the internet protocol ("IP") addresses of individuals who had accessed Illegal.CP, and
demonstrated which images each IP address had accessed.  Additional, warrant-based searches of
the server in December, 2005 and January, 2006 revealed contacts with images on Illegal.CP by
particular IP addresses.

### 2.      Mr. Sturm's activities

Agents obtained a court order authorizing interception of communications to and from the
email address from which the undercover agent had obtained the identifier and password.
Monitoring began on December 27, 2005.  In the ensuing two months, agents learned the process
by which the person or persons employing the email address sold access to Illegal.CP.  On
January 22 and 23, 2006, a Kenneth Sturm obtained access to Illegal.CP following the known
method.  He provided a residential address –  860 W. 100th Place, Northglenn, Colorado – an
email address – [dean30502@aol.com](mailto:dean30502@aol.com) – a telephone number, and a credit card number and
expiration date.  Agents were able to discern Mr. Sturm's IP address.

Examinations in February and March, 2006 of a server on which Illegal.CP had been
hosted revealed that the person using the [dean30502@aol.com](mailto:dean30502@aol.com) email address had accessed child
pornography images on Illegal.CP.  America Online confirmed for agents that the
[dean30502@aol.com](mailto:dean30502@aol.com) email address was subscribed to Kenneth Sturm at 860 W. 100th Place,

Denver, Colorado.  The United States Postal service confirmed this as Mr. Sturm's residential

address.  The Colorado Crime Information Center disclosed that Mr. Sturm was registered as a

sex offender in Northglenn and had in 2001 been convicted of pandering in Ohio sexually-oriented

matter involving a minor.  Agents surveilled the residence at  860 W. 100th Place, Northglenn

("Northglenn Residence") and found parked in the driveway a car registered to Mr. Sturm.

### B.      Issuance of the warrant

On August 3, 2006, based upon Agent Wells' averments, a magistrate judge issued a

warrant for a search of the Northglenn Residence.  The warrant provided, "YOU ARE HEREBY

COMMANDED to search on or before August 13, 2006 within 10 days the person or place

named above for the person or property specified... ."  It identified the place to be searched as the

"single story house with a single car garage attached," located at "860 W. 100th Pl. Denver, CO."

### C.      Execution of the warrant

#### 1.      Entry into the residence

At 8:16 A.M. on the morning of August 10, 2006, Agents Wells, Palmer, Schwaigert, and

Stoffregen, and others, executed the warrant.  They announced their identities and purpose to Mr.

Sturm's mother, who answered the door.  They then swept through the house in order to secure

it.

Upon entering a basement bedroom, Agent Palmer encountered Mr. Sturm.  Mr. Sturm

was standing, wearing only underpants, facing into a closet, hunched over, manipulating an object

at waist level.  Agent Palmer ordered Mr. Sturm to show his hands and to back away from the

closet.  Mr. Sturm complied.  Agent Palmer passed Mr. Sturm to Agent Schwaigert, standing

behind, then looked into the closet.  At waist level, where Mr. Sturm had been reaching, sat a rifle

case.  Two of four latches had been unfastened.  Agent Palmer instructed Agent Schwaigert to handcuff Mr. Sturm.  Upon further inspection of the case, Agent Palmer found a rifle, containing five live rounds in the magazine and one in the chamber.

Agents escorted Mr. Sturm upstairs to the living room, where he remained while they secured the rest of the premises.  Once the house was secure, agents removed the hand cuffs from Mr. Sturm.  In response to Mr. Sturm's request for clothes, an agent retrieved a pair of shorts, which Mr. Sturm put on.  Agents denied Mr. Sturm's request to re-enter his room for additional articles.

The search of the house yielded a second rifle, found in the attached garage, a shot gun in a crawl space across a hallway from Mr. Sturm's bedroom, and more than 200 rounds of ammunition in Mr. Sturm's bedroom.  Agents also discovered two computer stations, consisting of monitors, cables, and a printer, but no central processing units.  Mr. Sturm's mother explained that Mr. Sturm had taken two computers that normally resided in the house to his state probation officer.  Agents nevertheless retrieved twelve CD-Rom discs.

## 2.    Interrogation of Mr. Sturm

While the search proceeded, agents moved Mr. Sturm, shirtless, to an armed chair in the dining room, situated between a table and a wall.  The space between the table and the wall was narrow, so that exit from the chair was possible only by turning the chair sideways.  One agent sat across the table from Mr. Sturm.  Agent Schwaigert sat to Mr. Sturm's right.  Other agents were occupied around the house, including the dining room and adjacent living room, searching for contraband.  Mr. Sturm testified that, had he felt free to move about the house, he would have obtained a shirt.

Agent Schwaigert told Mr. Sturm the purpose of the search.  He explained that agents had handcuffed Mr. Sturm for officer safety and disclaimed any intention to arrest Mr. Sturm for child pornography.  He asked for permission to interview Mr. Sturm.  Mr. Sturm agreed to answer "appropriate" questions.  Agent Schwaigert did not tell Mr. Sturm that he was free to leave; Mr. Sturm did not ask.  Agent Schwaigert did not recite a *Miranda* warning.

The interview, which lasted twenty-five to thirty minutes, covered Mr. Sturm's personal, criminal, and employment history.  Mr. Sturm conceded that he had viewed adult pornography on the internet but insisted that his preference was for adult women.  Mr. Sturm confirmed that he had delivered the computers to his state probation officer.

Because they had found weapons, the agents summoned an agent of the Bureau of Alcohol, Tobacco, and Firearms, who determined that the guns had been manufactured outside Colorado.  ICE agents then arrested Mr. Sturm on weapons charges.

### D.    Inspection of the discs

Some doubt intrudes into the question when ICE agents first examined the contents of the discs seized from the Northglenn Residence.  Agent Stoffregen, charged with the task, recalls having conducted a preview of the discs, but cannot recall whether he performed the job on August 10 or August 16, 2006.  The latter date appears on a property receipt memorializing delivery of the discs to him.  He testified that his practice is to conduct a brief preview when he receives suspect media.

Agent Wells specifically recalled that Agent Stoffregen approached her on August 10, the day of the search, and informed her that he had previewed the discs, three of which contained child pornography.  This accords with Agent Stoffregen's archive file and examination report,

6

which indicate that he received the discs on August 10, 2006.

Agent Stoffregen performed a complete forensic evaluation of the discs on September 26, 2006.  The evaluation revealed several exploitive images,  including the image on which the instant charge is premised.  The images had been burned onto the discs in 2005 and early 2006.

## II.  Conclusions of law

### A.       Severance

Mr. Sturm argues that the  firearm possession count and the child pornography count were improperly joined pursuant to Fed. R. Crim. P. 8(a) because they are not of similar character, not based on the same transaction, and do not constitute parts of a common scheme.  In the event that joinder was appropriate, Mr. Sturm urges discretionary severance pursuant to Rule 14, arguing that evidence relevant to each count will be irrelevant to, and would prejudice just disposition of, the other count.

The Government responds that the same testimony will prove both counts because both the guns and the pornographic image were discovered during the same warrant search.  It disputes that joinder is unduly prejudicial.  It cites *United States v. Smith*, 795 F.2d 841 (9th Cir. 1986), *cert. denied*, 481 U.S. 1032, 107 S. Ct. 1964, 95 L. Ed. 2d 535 ( 1987), in which the Ninth Circuit affirmed a district court's exercise of discretion to decline to sever a child pornography charge from a weapons charge.  *Id*. at 851.

Fed. R. Crim 14(a) provides a mechanism for discretionary severance where joinder will result in unfair prejudice.  The dissimilarity of the two counts pressed here counsels in favor of severance.  *United States v. Wirsing*, 719 F.2d 859, 865 (6th Cir. 1983).  Furthermore, the charge of child pornography possession, particularly detestable and inflammatory conduct, creates a real

danger both that Mr. Sturm may be confounded in presenting defenses and that the jury might decide to convict Mr. Sturm of both crimes based upon a perceived criminal disposition. *United States v. Gray*, 78 F. Supp. 2d 524, 532 (E.D. Va. 1999).

As the Government correctly asserts, the Tenth Circuit has found no essential unfairness from joinder of counts "when the relationship of the charges grew out of the defendant's own conduct." *United States v. Colonna*, 360 F.3d 1169, 1178 (10th Cir. 2004) (quoting *United States v. Valentine*, 706 F.2d 282, 290 (10th Cir. 1983). However, this rule applies to affirm a refusal to sever where weapons are found with narcotics, because courts infer that the weapon and the drugs were used in pursuit of a common unlawful activity. *United States v. Price*, 265 F.3d 1097, 1105 (10th Cir. 2001), *cert. denied*, 535 U.S. 1099, 122 S. Ct. 2299, 152 L. Ed. 2d 1056 (2002). *See Valentine*, 706 F.2d at 286-287, 289; *United States v. Jones*, 213 F.3d 1253, 1260-1261 (10th Cir. 2000); *United States v. Heckard*, 238 F.3d 1222, 1231 (10th Cir. 2001); *Colonna*, 360 F.3d at 1173, 1178. Here, the Government does not argue that Mr. Sturm used the weapons in his possession in furtherance of his possession or use of child pornography. I therefore exercise my discretion pursuant to Rule 14 to sever the weapons count from the child pornography count.

### B.   Suppression

#### 1.   Sufficiency of the warrant affidavit

Mr. Sturm challenges as stale the information predicating the magistrate judge's finding of probable cause. He notes that approximately six months elapsed between his alleged purchase of the Illegal.CP subscription and the issuance of the warrant. The Government responds that indicia of child pornography possession, unlike narcotics possession, does not become stale for months, or even years. *United States v. Riccardi*, 405 F.3d 852, 861 (10th Cir. 2005), *cert. denied*, – U.S.

8

–, 126 S. Ct. 299, 163 L. Ed. 2d 260 (2005).

Whether information is stale depends upon the nature of the criminal activity, the length of the activity, and the nature of the property to be seized.  *Riccardi*, 405 F.3d at 860-861.  As the Tenth Circuit and other courts have observed,

> The observation that images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes is supported by common sense and the cases.  Since the materials are illegal to distribute and possess, initial collection is difficult.  Having succeeded in obtaining images, collectors are unlikely to destroy them.  Because of their illegality and the imprimatur of severe social stigma such images carry, collectors will want to secret them in secure places, like a private residence.  This proposition is not novel in either state or federal court: pedophiles, preferential child molesters, and child pornography collectors maintain their materials for significant periods of time.

*Id*. at 861 (quoting *United States v. Lamb*, 945 F. Supp. 441, 460 (N.D.N.Y. 1996)).  This accords with Agent Wells' observations in her affidavit.

For these reasons, courts considering allegations of child pornography possession have found no staleness resulting from delays of five months, *Lamb*, 945 F. Supp. at 460, between two and fifteen months, *United States v. Harvey*, 2 F.3d 1318, 1332 (3d Cir. 1993), five years, *Riccardi*, 405 F.3d at 861, and six and one half years, *People v. Russo*, 487 N.W.2d 698, 707-710 (Mich. 1992).  The interval here is well within the range generally tolerated.

### 2.      Good-faith reliance

In any event, nothing in the evidence leads me to conclude that the affidavit was so lacking in probable cause that no reasonable officer could have relied upon it in good faith.  *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984).  Instead, the evidence indicates that the officers executing the warrant acted with an objectively reasonable and subjectively sincere, good-faith belief that the warrant was properly issued by a neutral magistrate.  Agent

9

Wells, the case agent who averred the foundation for the warrant and participated in its execution, explained in her affidavit why the information she provided was not stale. She identified the unique attributes and habits of child pornography possessors that rendered the information timely in this case, thus demonstrating her good faith in compliance with constitutional requirements. *Riccardi*, 405 F.3d at 864.

Furthermore, Agent Wells' subjective belief was objectively reasonable, and, as set forth above, accords with the extant authority on the question. I attribute to Agent Wells and her colleagues reasonable knowledge of what the law prohibits and, obversely, allows. *Riccardi*, 405 F.3d at 863. Thus, a reasonably well trained officer would not have had any reason to believe that the search of the Northglenn Residence on August 10, 2006 was illegal. *Id.*

### 3.     The interrogation

It is undisputed that no officer advised Mr. Sturm of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) prior to his shirtless interview at the dining room table. The Fifth Amendment right to counsel, explained in *Miranda* and *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981) is triggered by custodial interrogation. *United States v. Bautista*, 145 F.3d 1140, 1147 (10th Cir. 1998), *cert. denied*, 525 U.S. 911, 119 S. Ct. 255, 142 L. Ed. 2d 210 (1998); *United States v. Erving L.*, 147 F.3d 1240, 1246 (10th Cir. 1998).

The question, then, is whether Mr. Sturm was in custody. That officers had not yet formally arrested Mr. Sturm is not dispositive. Rather, Mr. Sturm was in custody if his freedom of action was curtailed to a degree associated with formal arrest. *United States v. Erving L.*, 147 F.3d 1240, 1246 (10th Cir. 1998). The inquiry is whether a reasonable person in Mr. Sturm's

position would have understood his situation as the functional equivalent of formal arrest. *Id.*
The test is objective and fact specific – based on all the circumstances surrounding the encounter.
*United States v. Little*, 18 F.3d 1499, 1503 (10th Cir. 1994).

Examining the totality of the circumstances here, *United States v. Ritchie*, 35 F.3d 1477,
1485 (10th Cir. 1994), I conclude that Mr. Sturm was in custody. *United States v. Perdue*, 8 F.3d
1455, 1464 (10th Cir. 1993). Testimony at the hearing was inconclusive whether agents had their
weapons drawn when they entered the residence. However, it is undisputed that their objective
was to secure the house and immobilize its residents, and that Agent Schwaigert handcuffed Mr.
Sturm for officer safety. After removing the cuffs, Agent Schwaigert did not inform Mr. Sturm
that he was free to leave. Indeed, agents indicated to Mr. Sturm that he was not free to enter his
room to dress, a common precursor to exiting one's home. Instead, agents threw Mr. Sturm a
pair of shorts, but no shirt or shoes. Agent Schwaigert then escorted Mr. Sturm to an armed
chair in the dining room, situated between the table and a wall such that egress was impeded. The
house was full of agents. A reasonable person in Mr. Sturm's position would have concluded, as
Mr. Sturm did conclude, that he was not free to leave.

Mr. Sturm's statements were the product of a custodial interrogation. Because no agents
advised Mr. Sturm of his *Miranda* rights, the statements must be, and are, suppressed.

### 4.     Propriety of the forensic evaluation

Mr. Sturm argues that the ICE agents were obliged to obtain a new warrant before
examining the CD-ROM discs seized from his residence. He notes the mandate in the warrant
that officers perform the search within ten days of August 3, 2006, the doubt surrounding whether
Agent Stoffregen first examined the discs on August 10 or 16, and that Agent Stoffregen

11

performed the forensic examination on September 26, 2006, nearly two months after the search of the Northglenn Residence.

Agent Stoffregen was equivocal on the question when he first examined the contents of the discs. Agent Wells, by contrast, testified unequivocally and credibly that Agent Stoffregen reported to her on August 10, 2006 that he had previewed the discs and found illegal material on three of them. Agent Wells' recollection, which I credit, is consistent with Agent Stoffregen's archive file and examination report. I find and conclude, therefore, that the ICE agents first examined the contents of the discs on August 10, 2006.

I further note that the warrant did not set a ten-day deadline for examination of the discs but rather commanded officers to search the Northglenn Residence on or before August 13, 2006. Nor does Fed. R. Civ. P. 41 oblige the agents to examine the discs within any particular period of time. Indeed, the First Circuit and other courts have expressly concluded that neither the Rules nor the Fourth Amendment impose any such constraints. *United States v. Syphers*, 426 F.3d 461, 469 (1st Cir. 2005), *cert. denied*, – U.S. –,126 S. Ct. 2312, 164 L. Ed. 2d 831 (2006); *United States v. Triumph Capital Group, Inc.*, 211 F.R.D. 31, 66 (D. Conn. 2002); *United States v. Gorrell*, 360 F. Supp. 2d 48, 55 n.5 (D.D.C. 2004); *Matter of the Search of the Scranton Housing Authority*, 436 F. Supp. 2d 714, 727-728 (M.D. Pa. 2006); *United States v. Hernandez*, 183 F. Supp. 2d 468, 480 (D. Puerto Rico 2002). The requirement that Mr. Sturm proposes would not serve the purpose of the ten-day limitation in Rule 41: to prevent probable cause from evaporating while the warrant grows stale. *Triumph Capital Group*, 211 F.R.D. at 66; *Scranton Housing Authority*, 436 F. Supp. 2d at 727-728. Once the officers obtained the discs, any danger that probable cause would cease to exist passed. *Triumph Capital Group*, 211 F.R.D. at 66;

*Scranton Housing Authority*, 436 F. Supp. 2d at 727-728.

The *Hernandez* court analogized the off-site, delayed examination of computer media seized within the time prescribed by the warrant to the "the 'carting off' of whole file cabinets containing pounds of unsorted paper, to be searched off-site," which is permissible. *Hernandez*, 183 F. Supp. 2d at 480. "The rationale that searches can be executed off-site because of the volume of information has been extended to include computers." *Id*. at 480-481. I find this reasoning persuasive and add only that examination of computer media is often further impeded by limited access to requisite equipment and forensic expertise. For all of these reasons, leeway in the examination of the contents of media timely seized is reasonable under the Fourth Amendment.

Accordingly, it is ORDERED that:

1) the motion for severance of the counts [30] is GRANTED;

2) the motion for suppression of statements [32] is GRANTED; and

3) the motion for suppression of physical evidence and fruits of the search [33] is DENIED.

Dated: February ___22___, 2007, in Denver, Colorado.

BY THE COURT:

___s/Lewis T. Babcock_____
Lewis T. Babcock, Chief Judge

13